. LittletoN, Judge,
delivered the opinion of the court.; . •
The plaintiff, .a. naturalized American citizen born in Germany, seeks to recover income tax in the amount of $8,386.23 alleged to have been overpaid for 1941 on the ground that he was entitled to deduct from his gross income for that year, either as a war loss or as a casualty loss, the value of certain personal property which he claims he .owned, but which remained in Germany and Czechoslovakia when *3 be came to the United States in 1939. This property consisted of house furnishings in storage in Czechoslovakia, stocks and bonds held by banks in Czechoslovakia and Germany, and deposits of money in banks in both of those countries. The plaintiff never recovered any of this property.
The .house furnishings were accumulated by the plaintiff and his wife over a period of many years beginning with their marriage in 1911. From 1930 to 1935 the plaintiff lived in Aussig, Czechoslovakia, in a large house made available to him by United Chemical and Metallurgical Works, hereinafter referred to as United Chemical, a large chemical company having many factories throughout Europe. As the president of this company, it had been part of plaintiff’s duties to receive prominent visitors and to entertain in his home on a lavish scale. For that purpose and for his own comfort and pleasure, the plaintiff’s home was luxuriously furnished with expensive antique and modern furniture, all in keeping with refined living and a cultural background. When the United Chemical moved its headquarters from Aussig to Prague on December 31,1935, the plaintiff resigned his position as head of the company and went to Zurich, Switzerland, in the early part of 1936. However, under a Special contract with the company he continued to serve as an advisor and do special work. This necessitated his staying. in Aussig at least four months a year where a smaller house was made available to him, into which he moved part of his furnishings. The remainder of his furnishings were moved to Zurich. In the middle of 1938 the plaintiff mádé arrangements with Radler and Assmann, a storage and moving firm in Aussig, .to move the furnishings of the smaller house to Switzerland. However, because of the prevailing conditions, including Hitler’s attitude and directives, the 'storage firm was unable to move the furnishings. ' Shortly after the Germans entered Aussig, in October 1938, German officials required the furniture to be moved from the smaller house. After being first placed in an apartment belonging to United Chemical, the furnishings were, in the early part of=1939, placed in a warehouse of Radler and Assmann. Although the plaintiff during • January and February. 1939 contacted the storage firm by mail and phone, all efforts to have the furnishings shipped to Switzerland or the United States were unsuccessful. The plaintiff was last in Aussig *4 on September 8,1938, and did not see any of these furnishings after that date. In 1946, in answer to his inquiry, Eadler and Assmann informed him that the stored objects liad been taken upon order of the Gestapo in 1943 and. sold: at public auction.
. During 1936 and 1937 the plaintiff had purchased Hungarian gold bonds and shares of I. G. Farben stock. He did not at any time take physical possession of these securities, but left the former with the Bohemian Union Bank in Prague and the latter with the same bank in Berlin. The Hungarian gold bonds were sold in 1942 at the direction of the German Gestapo and the proceeds were credited to the plaintiff’s account. A stock dividend on the I. G. Farben stock was credited to the plaintiff’s account in 1942. He has never received the proceeds from the sale of the Hungarian gold bonds, nor has he ever received the I. G. Farben stock or anything of value therefor.
On November 14, 1941,. the plaintiff had on deposit with the Dresden Bank, Stuttgart branch, Germany, KM 490. While this amount was never withdrawn by the plaintiff, the account had a balance of zero on October 4,1943.
During his association with United Chemical, the plaintiff had a personal drawing account with the company in which the company credited to him such items as salary, director’s fees and other amounts. While it was shown that there was a balance in this account of 244,833 crowns and 63 hellers (Czechoslovakian currency) during November and December 1941, the plaintiff never withdrew any of that amount. This as well as the other accounts mentioned above were labeled by the banks as “preferred' blocked credit,” “blocked account;” or “blocked credit.” This meant that the owner could not remove the funds from the country without obtaining a permit from the German government, and such permit was unobtainable by plaintiff.
During 1937 and 1938 plaintiff was a director of a subsidiary of United Chemical at a salary of 10,000 Czechoslovakian crowns per year. He never received any of the amounts due him for either of those years. In 1938 when he was spending the greater-part of his time in Switzerland, the plaintiff made application for the release of his salary *5 fob 1937, but the. Czech National Bank refused and asked for proof as to the plaintiff’s citizenship and how long he had been permanently residing in Switzerland. ■'
In his claim for refund filed with the Commissioner of Internal Revenue on September 23,1942, the plaintiff claimed the deduction here claimed, under th¿ terms of section 127 of the Internal Revenue Code, 26 U. S. C. 127,. which provides in part as follows:
§ 127. WAS LOSSES — (a) CASES' IN WHICH LOSS DEEMED SUSTAINED, AND TIME DEEMED SUSTAINED
For the purposes of this chapter — * * *
(2) PeopeRtx in enemy countries. — Property within any country at war with the United States, or within an area under the control of any such' country on the date :war with such country was declared by the United States, shall be deemed to have been destroyed or seized on the date war with such country was declared by the United States.
War with Germany was declared on December 11, 1941, and under the terms of this section the plaintiff contends that he is entitled to a deduction for the year 1941 in an amount equal to the value of his property which remained in Germany and Czechoslovakia. Defendant contends that the plaintiff did not own the property on the date of our declaration of war on Germany or if he did that he has failed to prove the value thereof as of that date. Plaintiff’s claim for refund filed with the Commissioner of Internal Revenue was based entirely on this section.
Under this section the taxpayer ás a prerequisite to claiming a loss must show ownership of the property involved on the date of declaration of war. Here that date is December 11, 1941. The Treasury Regulation 26 CFR 29.127 (a)-l, chap. 1, p. 494 (1949 Ed.), issued under this section, provides in part as follows: ...
* * * for the taxpayer to claim a loss, with respect to such property he must own such property or an interest therein at such time. If before such time, the property was destroyed or confiscated, Section 127 is not applicable with respect to such property. For-example, a taxpayer owned property in an enemy country before war was declared on such enemy by the U. S., and such property was confiscated by the enemy before the date war *6 was declared. The seizure was not in the course of military or naval activities. The taxpayer may not claim a war loss with respect to such property under section 127.
The question is one as' to whether on December 11, 1941, the plaintiff owned the property here involved within the meaning of Section 127. Adler v. Commissioner, 8 T. C. 726, A tax deduction is a matter of legislative grant and to be entitled thereto the taxpayer must bring himself clearly within the provisions allowing the deduction.
On November 25,1941, the German Government under the authority of paragraph three of the Eeich Citizen Law of September 15, 1935 (Eeich Law Gazette Part I), issued its “Eleventh Executive Order” entitled “First Decree Eelating to the Eeich Citizen Law of November 25, 1941,” which provided in part as follows:
Paragraph 1. No Jew who has his regular residence abroad can be a German national. Eegular residence abroad exists when a Jew resides abroad under circumstances permitting of the recognition that he is staying there not temporarily.
Paragraph 2. A Jew shall lose German nationality: (a) If at the time this decree becomes effective he has his regular residence abroad, with the becoming effective of this decree; * *' *
Paragraph 3. (1) The property of the Jew who loses German nationality by virtue of this decree shall with the loss of nationality become forfeit to the Eeich. * * *
Paragraph 12. The decree applies also to the Protectorate of Bohemia and Moravia and in the annexed Eastern Territories.
The plaintiff is of Jewish descent and the property here involved was located in Germany and in that part of Czechoslovakia known as Bohemia. He entered the United States as a German national in 1939 with the intention of residing here permanently, which he has done. In his testimony plaintiff stated that he lost his German nationality under the November 25, 1941, decree.
. The November 25,1941, decree was one of several directed at Germans of Jewish descent during the late thirties. (See Findings 25 and 26.) During this period it had become exceedingly difficult for them to deal with their property *7 because of these decrees. In 1938 the plaintiff, while then residing in Switzerland, was unsuccessful in his efforts to remove the house furnishings from Czechoslovakia because of the directives of the Hitler regime. He met with the same result during that same year in an effort to remove money from the. Czech National Bank in Czechoslovakia. _ •
In the light of this decree and its applicability to those who found themselves in the situation in which the plaintiff here found himself, can it be said that the plaintiff retained a' sufficient interest in the property involved so that on December 11, 1941, he could sustain a loss under the provisions of section 127? The defendant contends that he did not. We agree with that contention. The test which must be adopted in determining “sufficient interest” is a practical one. This identical question as to' the nature of the test under section 127 was before the court in Rozenfeld v. Commissioner, 181 F. 2d 388, 390, where the court stated:
* * * We understand from this that the test is a practical one, and does not depend upon an absolute forfeiture of all legal right. * * * The revelant consideration, as we understand the Supreme Court [referring to United States v. White Dental Co., 274 U. S. 398], is not the legal consequences of the seizure, but how completely the owner is dispossessed; i. e., the remoteness of any recovery of the property or its proceeds.
In the White Dental case, sufra, a deduction for the loss of property sequestered by the German government in 1917 was allowed even though it appeared that legal title remained with the taxpayer, since the possibility of his ever regaining the property was purely conjectural because of the hazards and uncertainties of war. We believe this to be the correct test. In applying this test to the instant case, we hold that the decree of November 25,1941, so voided any control which the plaintiff might have exercised over his property that on December 11,1941, he had nothing to lose with respect to the property here involved which had not already been lost.
While his claim for refund filed with the Commissioner of Internal Revenue was based solely on the grounds above discussed, the plaintiff in his suit here has included an alternative ground for recovery under section 23 (e) (3) of Title 26, U. S. C. (1946 Ed.). This section provides for the deduc *8 tion of losses “of property not connected with the trade or business, if the loss arises from fires, storms, shipwreck, or other casualty, or from theft.” Plaintiff asserts that if the decree of November 25,1941, resulted in the loss of the property involved here then he is still entitled to a deduction for the year Í941 under the terms of this section.* Defendant contends (1) that having failed to assert this basis for recovery in his claim for refund filed with the Commissioner, the plaintiff may not rely on this section in his suit here, and (2) that even if consideration is given here to his claim under section 23 (e), the nature of the loss sustained is not one which comes within the meaning of “or other casualty” as used in this, section.
Section 322 of the Internal Revenue Code, 26 U. S. C. (1946 Ed.) § 322, sets forth the provisions which govern the filing for a tax refund. The Treasury Regulation 26 CFR 29.322-3 (b), chap. 1, p. 630 (1949 Ed.), issued thereunder, reads in part as follows:
* *' * The claim must set forth in detail and under oath each ground upon which a refund is claimed, and facts sufficient to apprise the Commissioner of the basis thereof. [Italics supplied.]
This ■ or similar worded regulations have long been in existence under section 322, and the courts, in the desire to further settlement within the Treasury Department whenever possible, have ruled that such statutory prerequisites must first be met before resort to court action may be had. The question involved here was before the court in Real Estate Title Co. v. United States, 309 U. S. 13. In the Real Estate case the taxpayer had filed his claim with the commissioner based solely on section 23 (k) which provided for a deduction for obsolescence. The property involved there was a title .plant which the taxpayer had ceased to use during the taxable year. In the suit which followed the commissioner’s rejection of the refund, the taxpayer included an alternative ground of recovery under section 23 (f) which allows a corporation to deduct “losses sustained during the taxable year and not compensated for by insurance or otherwise.” The court after having decided that no *9 recovery could be bad under section 23 (k) went on to state concerning recovery under section 23 (f):
* * * Whether petitioner has satisfied those requirements we do not decide, for its claim for refund was based exclusively and solely on the ground that it was entitled to an allowance for obsolescence. Hence in absence of a waiver by the government * * * or a proper amendment, petitioner is precluded in this suit from resting on another ground.
This court in John Randolph Hopkins v. United States, 113 C. Cls. 217, 229, relied on the Real Estate case in rejecting the taxpayer’s effort to assert for the first time in this court a basis for recovery not contained in his claim for refund filed with the commissioner. There we stated:
The first ground for recovery, asserted herein, was not made the basis of either the refund claim filed in May 1937, or the one filed in April 1939, and cannot, therefore, be allowed even if there had been such a transaction as would come within the capital gains provisions.
See also on this point Stewart v. United States, 99 C. Cls. 585.
We hold, therefore, that having failed to assert section 23 (e) (3) as a basis for recovery in his claim filed with the Commissioner, the plaintiff may not now rely on such section in his suit here. Hence, we find it unnecessary to decide whether the loss sustained by the plaintiff comes within the provisions of this section. The petition is therefore dismissed.
It is so ordered.
Howell, Judge; Maddest, Judge; Whitakeh, Judge; and Jostes, Chief Judge, concur.
FINDINGS OF FACT
The court makes findings of fact, based upon the evidence, the report of Commissioner Eichard H. Akers, and the briefs and argument of counsel, as follows:
1. The plaintiff duly filed his Federal income tax return for the calendar year 1941 on March 7,1942. In that return he reported a gross income of $32,454.94, deductions of $3,123.10, net income of $29,331.84, and a tax payable of *10 $8,386.23, which was duly assessed by the Commissioner. The plaintiff paid the entire tax of $8,386.23 on March 9,1-942.
- On September 23, 1942, the plaintiff filed a claim for refund of the entire amount of taxes paid for the year 1941 on the ground that he had sustained certain war losses either on account of confiscation or seizure of his property which he had not claimed in his return. The Commissioner rejected that claim by statutory notice dated-October .16, 1945.
2. The plaintiff was born a German citizen on March 7, 1881, in Ulm, Germany. Pie was of Jewish descent. He received his elementary and higher education in Ulm and continued his education at the University of Munich and later at Heidelberg, from which latter university he received the degree of Doctor of Philosophy in 1902. After some further study in Karlsruhe, Germany, he was appointed first an instructor and later an assistant professor on the staff at a technical school .in Germany where he remained for three years. In 1909 he gave up the profession of teaching and accepted an executive position with the Welsbach Company, a large chemical and manufacturing company in Berlin. In 1921 he resigned his position with the Welsbach Company to become director general (a position comparable to that of a president of a corporation in the United States) of the United Chemical and Metallurgical Works (hereinafter . sometimes referred to as “United Chemical”) in Czechoslovakia. United Chemical was a large company with many factories in different parts of Europe.
3. As head of United Chemical, the plaintiff lived in Karlsbad, Czechoslovakia, from 1921. until 1930, and from 1930 to 1935 in, Aussig, Czechoslovakia. As head of that company he was paid the equivalent in American dollars of about $100,000 a year. United Chemical paid all income and other taxes on the plaintiff’s salary so that he received his entire salary without any deduction on account of taxes. In addition, United Chemical furnished to the plaintiff rent-free a large dwelling house which it owned and also furnished to him two servants, a gardener and a chauffeur.
. It was part of the plaintiff’s duties as head of the organization to receive prominent visitors and to entertain in his home lavishly and on a large scale. For that purpose *11 and for his own comfort and pleasure, the plaintiff furnished his home luxuriously with antique and modern furniture, expensive and rare rugs, oil paintings and etchings, a library ■of some 2,500 books many of which were special editions and collectors’ items, and fine glass, china, silver, and linens for service, all in keeping with refined living and a cultural, background.
4. On December 31,1935, when the headquarters of United Chemical were moved from Aussig to Prague, the plaintiff resigned his position as head of the company and went to Zurich, Switzerland, .in the early part of 1936. At the time of his resignation, he had been for some time a director •of the company which office he continued to hold and, in addition, he made a special contract with the company to advise them and do certain special work. Under that contractual arrangement, he was obliged to stay in Aussig, Czechoslovakia, at least four months a year. In connection with that arrangement, United Chemical made available to the plaintiff, in Aussig, a home, smaller than the large house which the plaintiff had previously occupied, so that when the plaintiff came to Czechoslovakia for the required four months each year he would have a place in which to live. The smaller house was registered as the residence of the plaintiff’s daughter but she spent most of her time in France. The plaintiff’s son lived in the smaller house until he came to this coimtry on October 10,1937. In the plaintiff’s absence from Aussig, the smaller house was maintained by the plaintiff’s chauffeur and housekeeper, a Mr. and Mrs. Seifert, until late in. 1938 when the plaintiff’s furnishings were removed therefrom, as hereinafter shown.
The plaintiff resigned as a director of United Chemical on December 31, 1938, and as a consultant to the company on March 31,1939.
.5. When the*plaintiff went to Zurich, Switzerland, in the early, part of 1936, as shown in the preceding finding, he had a part of his furniture which was in the large house heretofore referred to moved to Zurich and the remainder of the furniture moved into the smaller house in Aussig. The moving was done by Eadler and Assmann, a moving and storage company in Aussig. At that- time he purchased .certain *12 additional furnishings for the smaller house. From the early part of 1936 until September 1938, the plaintiff spent four and sometimes five months each year in the smaller house in Aussig. In the middle of. 1938, he made arrangements with Eadler and Assmann to move the furniture which he had left in the smaller house to Switzerland. At or about that time he secured a permit from the Swiss authorities to bring his furniture into Switzerland. That permit was originally due to expire October 31, 1938, but it was extended a month or.two. However, because of prevailing conditions, including Hitler’s attitude and directives, Eadler and Assmann were unable to move the furniture. The plaintiff was in Aussig for the last time, on September 8,1938, at which time his furniture and furnishings which he had left in Aussig were still in the smaller house.
Shortly after the Germans, came into Aussig about October, 1938, they required the plaintiff’s furniture to be moved from the smaller house in order that they might use the house for themselves. The furniture was first moved to a factory of the United Chemical, next to an apartment owned by United Chemical and, when the Germans desired the apartment, it was moved in the early part of 1939 by Eadler and Assmann to a storage warehouse of Eadler and Assmann.
6. In the meantime, the plaintiff had been making inquiries in regard to his furniture with the view of taking a substantial part of it to the United States and on January 25, 1939, received the following letter from Mrs. Seifert, heretofore referred to in finding 4:
Thank you for your letter. The furniture was stored on Monday. Now I will inform you about the contents of the cases. Cases No. 1-9 contained the books of Dr.. Max Mayer; Cases No. 10 and 11 contained the books of Albert.
Case No. 12 Bed linen and kitchen towels.
Case No. 13 Hand towels, large table cloths, napkins.
Case No. 14 Embroidered table cloths and lace centerpieces.
Case No. 15 Infant clothes. .
Case No. 16 Writing table accessories of Mrs. Mayer and Miss Hilde; Albert’s and Hilde’s ornaments.
Case No. 17' Pictures and glass tops.
*13 Case No. 18 Chandeliers from dining room and living room; candles and bulbs for chandelier; 1 glass top.
Case No. 19 Porcelain table service with .silver rims. Ornaments from hall. ■
Casé No. 20 All glass services.
Case No. 21 Marked S. Silver and bronzes.
Trunk containing curtains (and drapes), dresses, bathing suits, wrappers, towels, etc.
If the goods are to be sent to America, they must be repacked into other cases; I assume Mr. Assmann has informed you about all this. Also the oriental rugs were stored with the other goods because they must be there in care of a control. • Things are difficult because of rigid controls. The help of Trude has also had many difficulties and had no results so far. I have given her the glass. Let us hope that things are now straightened out.
I inquired about the couch, the chandelier, and the shoe cabinet. They intend to take them. I am not going to unpack again because of Mrs. Eosler because she seems to prefer dresses. There was only one bed, which I received. Ella already has her belongings at home. There is still a round table and the oval table from the hall which were intended not to be moved. I did not send any pictures to Gottfried because I did not know which ones to send. I have them packed in Albert’s cases. It is a difficult task. If you had been here it would have been so much easier.
I hope I managed everything to your satisfaction and hope that we shall see each other once more. Then I will report orally, Mrs. Mayer. The packer who had also done the packing when we moved before, has asked me for a tip. How much shall I give him? I assume
I wrote everything you had to know. I remain, with kind regards, also for Dr. Mayer and Miss Hilde.
7. On January 26, 1939, Eadler and Assmann wrote the plaintiff as follows:
Today Miss Thomas called on us with regard to the transportation of the household goods from Aussig to Zurich.
We gave Miss Thomas the requested information. However, we think it would be better to be in direct touch with you.
It is necessary to obtain a permit from the SubPrefect for the transportation of your household goods; in ad *14 dition we need a permit from the- Foreign Exchange Department at Karlsbad. We are inclosing two forms for the application to be sent to the SubPrefect. These forms must be filled out in duplicate.
In addition we need for transports into foreign countries, the customary list of all the objects to be- sent abroad. We ourselves will take care of obtaining the official permission from the competent authorities. We need only a draft of the. list of the household goods because we must make several copies of it. Please send us this list or empower us to make this list at the place where the household goods are stored (on the premises belonging to the United Chemical and Metallurgical Works).
We would take over the completed and signed application forms for the SubPrefect and would submit them at Aussig.
Concerning the transport of the household: goods, it is not entirely clear to us what portion should be sent to Zurich and what objects are to be sent to the United States. Should we also prepare the latter transportation ?
We anticipate your answer and will be glad to give you any further information.
8. On February 12, 1939, the plaintiff made the following reply to the letter of Radler and Assmann of January 26, 1939:
In answer to your letter of January 26, 1939, which I can answer only today because I was absent from Zurich, I wish to make the following statements: ■
1. Transport to Zurich is no longer being considered because we are immigrating to the U. S. A. in March.
2. The household goods to be sent are considerably reduced because already in the summer of 1938 (before decisive events took place) a considerable portion of the furniture was given away.
The dining room furniture and a chest from the háll-way were given to Mr. R. C. Jeffcott of Calco Chemical Company, Bound Brook, New Jersey. One room belongs to my son, Albert Henry Mayer, 421 Church Street, Bound Brook, New Jersey. My son moved from Aussig in July 1937. I assume that this room was kept separately by Mr. Seifert. However, I do not have any exact information about it. All the other objects are my property. Because I do not know which objects were moved from my home to the United Chemical and Metallurgical *15 Works, I am asking yon to make an inventory of all the objects there and I expressly empower you to do this. Mr. or Mrs. Seifert can give you exact information concerning the furniture for Mr. Jeffcott and concerning the furniture for my son.
The transportation will be simplified by the fact that all the household goods should be moved to the U. S..A.
However, it is not clear to me what the application to be sent to the SubPrefect in order to get a moving permit should contain. I assume that three permits must be had: (a) for Mr. Jeffcott, (b) for me, (c) for my son who has lived in the U. S. A. since October 1937.
It is known to you that we ourselves have been living at Zollikon, Switzerland, since December 30, 1935, and we had left in the house at Elbeblick 15 for the use of my son and my daughter all the household goods which were not sent to Zollikon. (This moving was handled by your firm.) My daughter got the house from the United Chemical and Metallurgical Works.
I am inclosing confirmation of our residence in Switzerland executed by the office of the Town Council of Zollikon. I have here also in my files a photostatic copy of the acknowledged notification of departure from Aussig. The original thereof is with Mr. Laugini-ger in the files of the United Chemical and Metallurgical Works.
I am inclosing the questionnaires you sent me, but I have filled them out only insofar as it was possible.
May I ask you to take every measure and to answer at once the questions raised in this letter.
Presumably I will be in Prague at the end of this or the beginning of the next month; this would enable us to have an oral discussion there. However, it would be desirable if until my arrival at Prague all the open questions mentioned in this letter were cleared up.
' May I ask you to give me the result of the inventory of the household goods and the inventory of the cases.
Thanking you for your effort.
9. The plaintiff and a representative of Radler and Assmann were unable, because of prevailing conditions, to meet in Prague at the time indicated in the last paragraph of the letter of February 12,1939. On March 6,1939, Radler and Assmann wrote the plaintiff as follows:
It is unfortunately not possible for us to see you at Prague after having been informed today that we cannot pass the frontier with our existing Czechoslovakian *16 passports. Our new passports will be issued in a few more days.
Therefore in the meantime we are writing to you and giving you the information which we received from Mr. and Mrs. Seifert.
The entire household goods to be moved are stored in the house at 27 Ohnsorgstrasse, as per the attached list.
Mr. Wanke of the Chemical Works, Aussig, will inform us tomorrow about the cuff links.
As we mentioned to you on the phone today, we shall send the list of the household goods to be exported to the Exchange Control at Karlsbad, and we Hope that then the transport will meet with no further difficulties.
We would like you to know that our packer is experienced in packing lift vans, and accordingly the space will be utilized entirely. Because there are already 21 cases with porcelains, etc., for the transport, we will need more than one lift van.
We are writing you by special delivery mail and we would appreciate it if you would call us on the phone again tomorrow.
The list of household goods referred to in that letter showed the following articles:

Moving List (Household Goods) of Hr. Max Mayer:

Living Boom:

2 brown velvet wing chairs, 2 round brown chairs.
Large bookcase with 1,000 books, including TJllstein.
Art History, Propylaen World History, Goethe 42 vols.
Complete works of Nietzsche, Schiller, Scheffel, and many others.
Writing desk with accessories.
1 Bronze chandelier, 2 Bronze vases, 1 Bronze tiger, 1 Bronze figure from piano.

Parlor:

Sofa, 5 easy chairs, 1 red velvet upholstered stool, 1 smoking table, 3 tables with ground glass tops.
1 crystal chandelier from Dining Boom.

Daughter’s Boom:

Copper bowl, tin candlestick, writing portfolio, all pictures, colored draperies, candlesticks, ornaments, 1 wicker arm chair.

Master Bedroom:

Linen cabinet.
1 large trunk with dresses, furs, scale, bedside chair.

*17
Glassware:

Cut crystal glass service for 20 people, consisting of 7 different pieces for each person.
28 glasses, 9 yellow liquor glasses..
12 crystal mocha cups, 9 porcelain mocha cups.
Silver-rim porcelain Coffee Service.
20 vases, 1 large crystal goblet, 1 yellow wine decanter, 1 bas-relief glass.
2 water jugs, 16 crystal dessert plates, 2 crystal platters.
Porcelain: White-silver rim.
Service for 12 persons, consisting of 5 pieces per person. 10 serving pieces.
Also Coffee Service for 12 people, complete with sugar, creamer and serving pieces.
Porcelain: Blue-white.
18 meat, 3 soup plates; 18 serving pieces, 2 sauce boats.
Silver Table Servicej Württemberg Metal Factory, for 12 persons, consisting of 7 pieces for each person.
3 silver baskets, 1 tin bowl, 7 salt cellars.
2 silver platters.
All kinds of kitchen pots and kitchen utensils.
1 Sewing table.
1 small white table/Dressing Boom.
1 Sewing Machine.
12 Persian throw rugs.
2 Persian Carpets.
36 pictures — Oil paintings.
Etchings, Engravings/photographs, family portraits and 21 cases (two of them belonging to Mayer, Jr.— No. 10 and 11).

Moving List of Mr. Albert Henry Mayer:

Boom consisting of furniture with gray ground surface, 1 couch with cushions, 1 wing chair, 1 arm chair, 1 chair, 1 writing desk, 1 bookcase with about 150 books.

Dining Boom for Pres. Jeffcott:

1 round table with leaves.
6 chairs.
2 wing chairs.
1 chest.
1 serving table.
Mr. Albert Henry Mayer, referred to in the above list, was the son of the plaintiff, and Mr. Jeffcott, likewise referred to in the list, was a friend of the plaintiff and the president of the company by whom the son was employed. *18 The plaintiff had decided to make a present of the dining room suite, referred to in that list, to Mr. Jeffcott. The 21 cases referred to in the letter accompanying the list had been packed by the • employees of United Chemical. The contents of these cases are described in the letter of Mrs. Seifert dated J anuary 25,1989, and heretofore referred to.
10. None of the plaintiff’s furnishings, referred to in the list of Eadler and Assmann set out in the preceding finding, or the 21 cases referred to in the letter from Mrs. Seifert were ever shipped from Aussig to Switzerland or the United States. The plaintiff never saw any of these items after he left Aussig on September 8, 1938, nor was any witness produced who saw them after that time. In 1943, they were taken by the German Gestapo from the warehouse of Eadler and Assmann where they were stored and sold at auction.
On January 9, 1946, the plaintiff made the following inquiry of Eadler and Assmann with respect to his furniture:
The last time I heard from you was in the summer of 1939 and you wrote me that there were difficulties to send the furniture abroad because the tax authorities had not yet given a permit to do so.
At this time I haven’t heard anything from you and, therefore, I would be glad to have your news as to what happened to the furniture.
On J anuary 26, 1946, Eadler and Assmann. made the following response to the foregoing letter from the plaintiff:
In answer to your letter of January 9,1946, we inform . you, that upon order of the Gestapo we have delivered to the former custom house at Aussig on April 8, 1943, the stored objects mentioned in your letter. Therefore, there is nothing left in our' storehouse. We are sorry not to be able to give you better news.
11. In 1942, the plaintiff with the assistance of his wife made a list of the furniture and furnishings which they had left in the small house in Aussig in 1938. They had before them at the time the inventory list as prepared by Eadler- and Assmann and set out in finding 9, which, together .with their memory of the items, enabled them to prepare a reasonably accurate inventory of the articles left in the small house in Aussig. Their inventory differs' in only minor re *19 spects from the Radler and Assmann inventory. It represents ■ substantially their furniture and furnishings which were in the smaller house at the time plaintiff left Aussig in September 1938.
12. The items in the inventory referred to in the preceding finding had come into the possession of the plaintiff in a variety of ways, including purchase, wedding presents at the time of the plaintiff’s marriage in 1911, and inheritance. In some instances, as in the case of bookcases, the plaintiff had them made. Dates of purchase included 1911,' 1917,- 1930, and 1936 and intervening years. In addition to the wedding presents, other articles had come to the plaintiff as gifts at other periods since that time. The principal evidence offered with respect to value was the plaintiff’s recollection of their •cost when acquired or manufactured and what would reasonably have been the cost at the time the articles came into the plaintiff’s possession through gift or otherwise; with the further evidence that because of their character, the manner in which they were cared for and the general rise in labor and material costs up to November and December 1941, their value in November and December 1941, was at least equal to their cost or value at the time of acquisition. The plaintiff, however, last saw these items of furniture and furnishings on September 8, 1938, when he was in Aussig the last time and no witness was produced who saw them after that time. As heretofore shown, after the plaintiff left, the items were first moved to a factory of United Chemical, then to an apartment of United Chemical, a little later (about January 1939) stored in the warehouse of Radler and Assmann, and in 1943 sold at public auction by the German Gestapo. This and such other evidence of value, as was produced .is insufficient to fix the value of. the plaintiff’s furniture and furnishings in November and December 1941.
13. On October 17, 1936, the plaintiff purchased 4% Hungarian gold bonds of a face value of 50,000 guilders at a cost of 57,174 Czechoslovakian crowns and 60 Czechoslovakian hellers; and on October 19, 1936, he purchased additional bonds of the same nature and the same face value (50,000 guilders) at a cost of 57,676 Czechoslovakian crowns and 15 Czechoslovakian hellers. These purchases were made *20 for cash through the Bohemian Union Bank at Aussig, Czechoslovakia, which bank issued its advice of purchase when the transactions were completed. On June 14,1937, the plaintiff purchased shares of I. G. Farben stock of a par value of 2,000 reichsmarks at a cost of 15,403 Czechoslovakian crowns and 15 Czechoslovakian hellers. This purchase was also made for cash through the Bohemian Union Bank at Aussig.
The plaintiff did not take physical possession of these securities but left them in the custody of the Bohemian Union Bank. Physically the Hungarian bonds were held by the Bohemian Union Bank at Prague, Czechoslovakia, and the I. G. Farben stock was located in Berlin, Germany, in the custody of the Bohemian Union Bank.
14. The 4% Hungarian gold bonds, referred to in the previous finding, were issued by the old Austrian-Hungarian Empire. After the defeat of Austria Hungary in 1918, the Allies distributed the prewar debt (including these bonds) among the nations which had succeeded to the territory of the old Austrian-Hungarian Empire, including Czechoslovakia. They were debenture bonds without a maturity date. The issuing government had a right to call these bonds at any time but the owner of the bonds could not compel the redemption thereof. After Hitler moved into and took control of Czechoslovakia on March 15, 1939, interest on these bonds was paid to the account of the owner thereof but the owner could not deal with the amount to his credit without the consent of a representative of the German Government who was called a “prokurer.”
15. In July 1942, the Bohemian Union Bank collected for the plaintiff’s account a stock dividend of additional shares of I. G. Farben stock of a nominal or par value of EM 500 and advised the plaintiff of this collection in a letter dated September 22,1942. That letter read as follows:
INI.. DEPOSIT account OF EMIGRANT
We herewith wish to inform you that pursuant to the correction in capital made known on 7/21/42 we have collected against surrender of dividend coupons No. 21 of EM 2000. — Shares
*21 KM 500. — I. G. Farben Shares with dividend certificate No. 23
for which we are crediting you on Stock Account “BERLIN.”
For charges we are debiting you with K — value as of today.
Boehmische Union-Bank.
The collection of the additional shares has today been reported to the local National Bank.
16. On January 10, 1946, the Bohemian Union Bank advised the plaintiff of the status of his securities as of December 31,1941, as follows:
Prague, 1/10/1946.
32760
Dr. Max Mayer
Scarsdale, Westchester County
New York.
BLOCKED INL. DEPOSIT ACCOUNT OF EMIGRANT
We give you below a statement as of December 31, 1941, covering the status of your securities.
Please check on this statement and if you find it correct please return to us the appended sheet signed.
At the same time we would ask you to take note of the general provisions given on the reverse side hereof, which are applicable until further notice to any business carried on with us.
FI. 100,000 4% Ungar. Goldrente C. C. with Certif. “i”
KM 2,000 I. G. Farben Shares “Berlin”
Lg 41,13,4 Coupon for 1937 of FI 100,000 4% Ung.
Gold-Kente CC. with Certif. “i”
E. & O. E.
Bohmische Union Bank.
17. In 1942, at the direction of the German Gestapo, the Bohemian Union Bank sold the 4% Hungarian gold bonds and credited the proceeds to the plaintiff’s account. Confirmation of the sale was forwarded to the plaintiff by the Bohemian Union/Bank in a letter dated at Prague, November 24,1942, which read as follows:
*22 SALE OF SECTJEITIES
Dr. Max Mayer,
Scarsdale, New York
c/o Secret State Police
State Police Management Office
Prague
BLOCKED account “n” 32760
Pursuant to your instructions or proposition of . . . we HAVE SOLD for you OR TOOK OVER FROM YOU On . . . the following securities, for which we are crediting you as follows. We are debiting your deposit account 1 with the securities. ...
Nominal Amt. or Piece

Bohmische Union-Bank.
The plaintiff has never received any of the proceeds of the foregoing sale. The evidence is insufficient to establish the value of these bonds in November and December 1941.
18. The stock of I. G. Farben was actively traded in on the Frankfort, Germany, Stock Exchange (one of the largest stock exchanges in Germany) on November 25, December 8, and December 11, 1941, at the following prices [the prices shown being in reichsmarks] :

Opening Closing

November 25, 1941_ 197% 197%
December 8, 1941_ 197% 197%
Décember 11, 1941_ 197% 197%
The plaintiff has never received the stock or anything of value therefor. By agreement of the parties, in the event *23 the Court should hold that the plaintiff is entitled to recover ■on account of a deduction in the loss on these securities, further evidence may be introduced with respect to. their value as well as the rate of exchange applicable thereto unless the parties are able to enter into a stipulation with respect thereto. The foregoing agreement with respect to the rate of exchange applies also to other items involved in this proceeding where, in the event the Court should hold that the plaintiff is entitled to recover, a determination of the correct rate of exchange is necessary in order to compute the amount of such recovery.
19. On January. 14,1941, the plaintiff had on deposit with the Dresden Bank, Stuttgart branch-, Germany, RM 500, Subsequent to January 14, 1941, Allgemeine Bankgesell-schaft, Stuttgart, successor to the Dresden. Bank, issued to the plaintiff the following abstract of entries in the account:

The plaintiff has never withdrawn any part of the foregoing deposit.
20. The account referred to in the preceding finding' was a ^preferred blocked credit” account. The terms “blocked *24 account,” “blocked credit,” or “preferred blocked credit” with, respect to the foregoing account and other situations referred to in these findings meant that the owner of the account or credit could not take the funds out of the country without obtaining a permit from the German Government.
21. During his association with United Chemical as president and director, the plaintiff had a personal account with the company in which the company credited to the plaintiff such items as salary, director’s fees, and other amounts and made charges in the account on account of payments made in behalf of the plaintiff. The balance in this account during November and December 1941 was 244,833 crowns and 63 hellers (Czechoslovakian currency). The plaintiff never withdrew any of this deposit. However, through charges by December 7,1949, the balance had been reduced to 231,170 crowns and 72 hellers, on which date United Chemical advised the plaintiff in part as follows:
Due to the legal regulations we have transferred your blocked deposit at our firm

of K mi,170.72

in favour of your blocked account at the Zivnostenska bank in Prague, as we have informed your lawyer, Dr. A. Schauer.
22. During 1937 and 1938 the plaintiff was a director of a subsidiary of United Chemical called the Bohmische Glanz-stoff-Fabrik system, at Elberfeld, Czechoslovakia, at a salary of 10,000 crowns for each of those years. In 1938 at which time he was spending the greater part of his time in Zurich, Switzerland, the plaintiff made application for the release of his salary for 1937. On July 7, 1938, the affiliated company made the following reply to his application:
The Czech National Bank has rejected our application of June 29th of this year for the release of the KC 10,000. — applied for for transfer for presence marks for the business year 1937 and they ask us for some proof of your citizenship and information as to how long you have permanently been residing in Zurich.
So that we may gratify the request of the Czech National Bank and be able to have an opportunity to procure the above-mentioned amount we would ask you *25 to let us know how long you have had permanent residence in Zurich and send us furthermore the requested proof of citizenship.
The plaintiff has never received the foregoing compensation for 1987 and 1938 or any part thereof.
23. In August 1938, when he was arranging to leave Aussig and Zurich, as shown in findings 5 and 6, the plaintiff obtained a German passport from the consulate at Zurich, Switzerland, for permanent residence abroad. At that time and continuing until he emigrated to the United States he was a German national. In March 1939, he left Switzerland and came to the United States as a German quota immigrant. In May 1939, he filed his so-called “first papers” for American citizenship and on December 6, 1944, he became a United States citizen through naturalization. He has resided in the United States continuously since March or April 1939 and has had no intention of returning either to Germany or Czechoslovakia. He is now a resident of Mendham, New Jersey. He lost his German nationality by the German decree of November 25, 1941, hereinafter referred to.
24. Prior to March 15, 1939, Czechoslovakia was an independent sovereign nation. Aussig and Prague are located in that part of Czechoslovakia known as Sudetenland. Sudetenland became a part of Germany under the Munich Pact of September 30,1938. Hitler marched into the Sudetenland in October 1938 and he made a protectorate of Czechoslovakia on March 15, 1939. Aussig and Prague are located in that part of Sudetenland known and designated as Bohemia.
25. On April 26, 1938, the German Government issued a “Decree concerning the registration of Jewish-owned property” which provided in part as follows:
Pursuant to the decree of October 18, 1936 (Reichsgesetzblatt I, p. 887) concerning the Enforcement of the Four Year Plan, the following is decreed:
Section 1. (1) Every Jew (Section 5 of the first decree pursuant to the Reich Citizenship Law of November 14, 1935) (Reichsgesetzblatt I, p. 1333) shall register and state the value of all of his property located within Germany and abroad as of the date when the present decree shall go into effect, in accordance with the follow *26 ing instructions. Jews of foreign citizenship shall be required to register and state the value of their property located in Germany only.
(2) The non-Jewish spouse of a Jew shall also be required to register and state the value of his or her. property.
(3) The property shall be listed separately for each person required to register.
* * * ■ * *
Section 4. The registration report must be filed on an official form by June 30, 1938, with the higher administrative authorities {hoehere Verwaltwngsbehoerde) having jurisdiction over the locality where the person required to register is residing. The higher administrative authority may extend the time limit for registration in individual cases for special reasons when it would be impossible to complete the registration report and the statement of value by the day set therefor; however, in such a case an estimate of the property and its value must be made by June 30, 1938, and the reason for the delay must be explained.
* * * * *
Section 7. The Commissioner for the Four Year Plan may adopt all measures necessary to insure the proper use of the property subject to registration in accordance with the interests of the German economy.
Section 8. (1) Whoever intentionally or by negligence violates any of the foregoing provisions concerning the duty to register, to state the value, or to notify, or does not comply with them correctly or in time, or violates any regulations issued pursuant to section 7 of the present decree, shall be punished by imprisonment and by a fine or by one of these penalties; in particularly serious cases of intentional offenses, confinement in a penitentiary not to exceed ten years may be imposed. The offender is also punishable if he has committed the offense abroad.
(21 The attempt shall be punishable.
(3) In addition to the penalties provided for by subsections (1) and (2) any property may be confiscated insofar as it was involved in the punishable offense; confiscation shall be ordered in addition to confinement in a penitentiary. If no definite person can be prosecuted or convicted, confiscation may be ordered independently whenever the prerequisites for such confiscation exist.
*27 26. On December 3, 1938, the German Government issued a “Decree concerning the utilization of Jewish property” which provided in part as follows:
Pursuant to section 1 of the Second Decree of the Commissioner for the Four Year Plan, based upon the Decree concerning the Registration of Jewish-owned Property of November 24, 1938 (Beichsgesetsblatt _ I, p. 1668), the following is decreed in consultation with the Reichsministers concerned: * * *
Article II
Agricultural and Forest Enterprises
Real and Other Property
Section 6. A Jew (section 5 of the First Decree pursuant to the Reich Citizenship Law of November 14, 1935) (Beichsgesetsblatt I, p. 1333) may be ordered to sell, either wholly or in part, his agricultural or forest enterprise, his other agricultural and forest property, or any real or other property within a specified time. Certain conditions may be attached to the order. The provisions of sections 2-4 shall apply correspondingly.
s¡í $ ‡ Jfc
Section 8. (1) The disposal by Jews of real property and of rights which by law have the character of real property rights shall require approval for its validity. The disposal of other property, shall require approval in order to be valid, if such sale had been ordered pursuant to section 6 of the present decree. The same shall apply for any disposal by the trustee.
(2) The provisions of subsection 1 shall apply also to contracts wherein the party assumes obligations.
(3) The provisions of section 1, subsection 2 and of section 2 of the order issued pursuant to the Decree concerning the Registration of Jewish-owned Property of April 26,1938 (Beichsgesetsblatt I, p. 415) shall apply correspondingly.
Article III
Compulsory Deposit of Securities
Section 11. (1) Jews shall deposit with a Foreign Exchange Bank, within one week from the effective date of the present decree, all their stocks, shares in mines, *28 bonds and similar securities. Newly acquired securities shall be deposited within one' week from the date of acquisition. The holder of such securities belonging to a Jew may transfer the same only to a Foreign Exchange Bank for the account of the Jew.
(2) Insofar as securities are already deposited with a Foreign Exchange Bank for the account of a Jew, or claims of public record or coupons granting a preferred annuity are deposited with an administrative authority, Jews must immediately notify in writing the bank, the administration of Public Debts or the administrative authority of the fact that they are Jews. In cases coming within section 1, sentence 3, such declaration shall be made to the holder.
(3) The deposits and the accounts shall be marked as Jewish.
Article IY
Jewels, Gems and Objects of Arts
Section 14. (1) It shall be unlawful for Jews to acquire, pawn or sell in the open market objects of gold, platinum or silver as well as precious stones and pearls. Such objects may be acquired only by public purchasing offices established by the Reich, except in cases where a pledge of Jewish property already existing at the time of the effective date of this decree is realized on behalf of a non-Jewish creditor. The same shall also apply to other jewels and objects of arts insofar as the price for the individual object exceeds 1000 Reichsmark.
(2) The provision of subsection 1 shall not apply to Jews of foreign nationality.
Article Y
General Provisions
Section 15. (1) The approval for the sale of a Jewish business establishment, of real estate or other property belonging to Jews may be given subject to conditions which may include payments in money by the acquiring party for the benefit of the Reich.
(2) The approvals mentioned in section 1 may also be granted with the qualification that the Jewish seller shall receive obligations of the German Reich, or shall be entered as creditor in the Register of Public Debts, instead of receiving all or part of the consideration provided for by the sales contract.
*29 Section 17. [This section provided among other things that the administration of the decree in the Sudeten German Territories was vested in the Chief Administrative Officers of the District.]
$ ‡ ‡ ‡
Section 22. The provisions of the present decree shall be applied by analogy in the Sudeten German territories whenever they cannot be applied directly.
27. On November 25,1941, the German Government issued its “Eleventh Executive Order” entitled “First Decree Relating to the Reich Citizen Law of November 25,1941,” which provided in part as follows:
Paragraph 1. No Jew who has his regular residence abroad can be a German national. Regular residence abroad exists when a Jew resides abroad under circumstances permitting of the recognition that he is staying there not temporarily.
Paragraph 2. A Jew shall lose German nationality: (a) If at the time this decree becomes effective he has his regular residence abroad, with the becoming effective of the decree; (b) If he establishes his regular residence later abroad, with the transfer of the regular residence to somewhere abroad.
Paragraph 3. (1) The property of the Jew who loses German nationality by virtue of this decree shall with the loss of nationality become forfeit to the Reich. Furthermore there shall become forfeit to the Reich the property of Jews who are stateless at the time this decree becomes effective and last held German nationality if they have, or establish, their regular residence abroad.
(2) The forfeited property shall serve for the furtherance of all purposes that are related to the solution of the Jewish question.
*****
Paragraph 12. The decree applies also to the Protectorate of Bohemia and Moravia and in the annexed Eastern Territories.
28. On December 11, 1941, the Congress declared that a state of war existed between the United States and Germany.
CONCLUSION OF LAW- -
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter *30 of law that plaintiff is not entitled to recover, and his petition is therefore dismissed.
Judgment is rendered against plaintiff for the cost of printing the record herein, the amount to be entered by the clerk and collected by him according to law.

 Modified. See opinion of October 6, 1953, infra.